UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Patricia K. Brown, | ) | Civil Action No.  5:19-cv-1358-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, Commissioner of Social Security,[1] | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.       Relevant Background

A.       Procedural History

On March 18, 2016, Plaintiff filed an application for DIB alleging disability as of

September 15, 2014.[2] Tr. 175-81. Plaintiff's claim was denied initially, Tr. 124-27, and upon

reconsideration, Tr. 132-38, and Plaintiff requested a hearing, Tr. 139-40. On February 7, 2018,[3]

a hearing was held before an Administrative Law Judge ("ALJ") and testimony was taken from

---

[1] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g), Fed. R. Civ. P. 25(d).

[2] Plaintiff later amended her alleged onset date to January 1, 2015. Tr. 205.

[3] Although the ALJ's decision and Plaintiff's brief indicate the hearing took place on January 10, 2018, the hearing transcript indicates a date of February 7, 2018. Tr. 42-72.

Plaintiff, who was represented by counsel, and from a vocational expert ("VE"). Tr. 97-121. On April 26, 2018 the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 22-36. Plaintiff requested review of the decision from the Appeals Council, Tr. 173-74, and the Appeals Council denied review on March 5, 2019, making the ALJ's decision the Commissioner's final decision for purposes of judicial review, Tr. 1-7. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed May 9, 2019. ECF No. 1.

B.    Plaintiff's Background

Born in October 1974, Plaintiff was 43 years old at the time of her administrative hearing. Tr. 48. In her initial Disability Report-Adult form Plaintiff noted that she completed four or more years of college in 2003. Tr. 210. Plaintiff listed her past relevant work ("PRW") as a property manager, school bus driver, and substitute teacher. Tr. 247.[4] Plaintiff indicated that she stopped working because of the following medical conditions: neuropathy; painful involuntary movement in hands, fingers, toes, feet; lower back pain radiating to legs and shin bone; inability to stand or sit for more than 2 hours; sleep apnea; migraine headaches; muscle cramps/anterior in legs; fibromyalgia; anxiety; and chronic leg pain. Tr. 209. She indicated she was 5'0" tall, weighed 203 pounds, and her conditions caused her pain or other symptoms. Tr. 209.

C.    Administrative Proceedings

Plaintiff appeared with counsel in Columbia, South Carolina for her administrative hearing on February 7, 2018. Tr. 44. VE J. Adger Brown, Jr. also appeared and testified. *Id.*

1.    Plaintiff's Testimony

---

[4] At the hearing the ALJ indicated he was not considering Plaintiff's PRW to include that of a substitute teacher. Tr. 52-53; *see also* Tr. 34-35 (noting PRW as school bus driver and property manager).

In response to questions from the ALJ Plaintiff stated that she was 43 years old, 5'0" tall, weighed 228 pounds, was right-handed, separated, and lived in a house with her children aged 12 and 13. Tr. 48-49. In response to a question about her current source of income, Plaintiff testified that her family assisted her and that she received food stamps and was on Medicaid. Tr. 49. Plaintiff confirmed that she had a driver's license but that she rarely drove, sometimes driving to her mother's house approximately three miles away. Tr. 50. Plaintiff stated that she had four years of college and could read, write, and pay bills. *Id.* Plaintiff indicated she had not worked since January 1, 2015, and that she had last worked for Will Hoyt Properties as a property manager for an apartment complex. Tr. 50-51. Plaintiff also worked as a property manager for American Management Services and Haroldson Stanley J. Member. Tr. 51. Plaintiff said she had worked for Richland County School District as a special needs bus driver. Tr. 51.

Plaintiff indicated she had problems with her right elbow, noting it would "just lock up" momentarily and that she had pain in her elbow even when it is not locked up. Tr. 53. Plaintiff described the pain as varying in intensity from a one to a seven on a ten-point pain scale. Tr. 53-54. Plaintiff said she took Tramadol, which helped with her elbow pain, and that no surgeon had recommended surgery on her elbow. Tr. 54. Plaintiff also indicated she was having problems with her right knee—she was in a "lot of pain and a lot of swelling and it slips[.]" Tr. 54. Plaintiff characterized the knee pain as usually being at a five to a ten on the ten-point pain scale. Tr. 54. Plaintiff explained she had had microfracture surgery[5] on her right knee, and her surgeon tightened her kneecap and brought it back from the side. Tr. 55. Plaintiff indicated the surgeon was waiting to see whether it helped before considering further knee surgery. Tr. 55. She said Tramadol did

---

[5] Knee microfracture surgery is a "common procedure used to repair damaged knee cartilage. Cartilage helps cushion and cover the area where bones meet in the joints." https://medlineplus.gov/ency/article/007255.htm (last viewed Jan. 15, 2021).

not always help with that pain. Tr. 55. Plaintiff indicated she had been diagnosed with anxiety and depression, but the new medications she was taking for those conditions were helping her. Tr. 55. Those medications were prescribed by Plaintiff's family doctor. Tr. 57. Plaintiff testified that she did not see a counselor nor had she been hospitalized in a mental ward for those conditions. Tr. 55. Plaintiff also noted she sometimes had panic attacks, which were not caused by anything in particular but mostly occurred after "an episode with the muscles." Tr. 55. Plaintiff explained she had a muscle biopsy to discovery dystonia, which she had in her hands, lower arms, and whole leg and feet and toes. Tr. 56. Plaintiff was also diagnosed with neuropathy, for which she takes Lyrica and Gabapentin. Tr. 56. Plaintiff said Gabapentin makes her sleepy but helps a little. Tr. 56. She said the Tramdol and Gabapentin sometimes helped with back pain, depending on what the pain level was. Tr. 56. Plaintiff also indicated she had pain in both legs, which she characterized as being "pretty bad[,] probably between five and ten." Tr. 56-57.

Plaintiff indicates she could sit for about two hours before needing to stand and could stand about 30 minutes to an hour before needing to sit down. Tr. 57. Plaintiff said she could not walk far before needing to stop and rest. Tr. 57. Plaintiff said she could probably lift and carry 15 pounds or less, "probably much less than that now." Tr. 57. She said she would be able to bend down from standing to pick up a dropped pencil. Tr. 57. Plaintiff said she could sometimes kneel down on one knee, could not squat down, and could crawl across the floor, although it would be painful. Tr. 58.

Plaintiff said her mom sometimes helped her with her shower and getting dressed. Tr. 58. She also indicated she was not able to style her own hair anymore and often had to wear a hat. Tr. 63-64. Plaintiff said she tried to cook and wash dishes sometimes. She did not vacuum or mop, but she would sweep. Tr. 58. Plaintiff said she did laundry when she was able to lift the clothes. Tr. 58. Plaintiff said she goes grocery shopping and does some things outside the house. Tr. 58. In

4

response to questions from her counsel Plaintiff indicated she rode in the cart when grocery shopping. Tr. 67. Plaintiff described her typical day as getting up, showering, cooking breakfast, and getting her children ready for school. Tr. 59. Plaintiff indicated she tried to clean up and help her girls with their schoolwork. On Sunday, she did about the same thing and went to church. Tr. 59.

In response to questions from her attorney Plaintiff clarified that her mother, who is retired and lives nearby, helps Plaintiff cook, clean the house, and helps transport her daughters to school. Tr. 59-60. Plaintiff again noted she weighed approximately 228 pounds and indicated she had had gastric bypass surgery and had gotten to 150 or 155 pounds in 2011 to 2012. Tr. 60. Plaintiff said she and her doctor believed depression and medication had caused her to gain weight. Tr. 60. Plaintiff noted she had dystonia, which she described as an incurable muscle disorder that meant muscles were not controlled as normal. Plaintiff explained she would have involuntary movement of her muscles approximately three-to-five times a week. Tr. 60-61. Plaintiff indicated the dystonia in her hands would last approximately six hours and could last 24 hours in her feet. Tr. 61. Plaintiff indicated the dystonia could happen between three-to-five times per week, and there would be no way of knowing how long it would last. Tr. 62. Plaintiff again indicated her panic attacks were sometimes tied to her dystonia attacks. She explained that the panic attacks caused her to feel hot and sweaty and that her heart would race and she would cry. Tr. 62. Plaintiff noted she sometimes had migraine headaches once every two weeks or so and sometimes more frequently in the summer. Tr. 62-63. The migraines last from an hour to a couple of days. Tr. 63. Plaintiff also indicated she had bladder-control issues for which she takes medication and sometimes wears pads or diapers. Tr. 63. Plaintiff indicated she had swelling in her legs that impacted her ability to walk, stoop, and sit. Tr. 63. Plaintiff indicated she used both a leg brace and a cane but sometimes could

not put the brace on because of swelling in her leg. Tr. 64. Plaintiff indicated she had asked her

doctor whether she should use a cane, and her doctor responded in the affirmative. Tr. 64. Plaintiff

indicated she used a cane because she had falls that happened "out of nowhere" two-to-three times

per week because of her knee issue. Tr. 64. Plaintiff also indicated she had difficulty gripping

objects, including pencils. Tr. 65, 67. Plaintiff indicated the medications she took, especially

muscle relaxers, had the side effect of making her sleepy. Tr. 65-66. Plaintiff noted she had sleep

apnea but was not wearing the prescribed sleep mask because it caused her to panic. Tr. 66.

2.    VE's Testimony

The VE described Plaintiff's PRW as school bus driver, Dictionary of Occupational Titles

("DOT") number 913.463-010, semi-skilled, medium exertion, SVP of 4; property manager, DOT

number 250.357-014, skilled, light exertion, SVP of 5. Tr. 68. The ALJ asked the VE to assume a

hypothetical individual of Plaintiff's age, education, and past job experience with the following

limitations:

> [A]ssume this hypothetical individual would be limited to light work with frequent
> climbing of ramps and stairs. No climbing of ladders, ropes, or scaffolds.
> Occasional balancing and stooping. No kneeling, crouching or crawling. They
> would further be limited to occupations requiring no more than simple, routine,
> repetitive tasks not performed in a fast paced production environment involving
> only simple, work related instructions and decisions and relatively few workplace
> changes. Would be further limited to occupations requiring no more than occasional
> interaction with coworkers and members of the general public. The claimant or the
> hypothetical individual would be able to maintain concentration, persistence and
> pace for two hour increments.

Tr. 68. The VE confirmed that would exclude all of Plaintiff's past work, but identified the

following other available light, unskilled jobs with an SVP no higher than 2: Gra[d]ers and Sorters,

representative DOT 789.687-146, nationally 25,000 jobs; Product testers and Weighers,

representative DOT 922.687-054, nationally 12,000; and Quality Control Examiners,

representative DOT 739.687-102, nationally 60,000 jobs. Tr. 68-69. The VE explained that the

numbers he provided represented "approximately 50% of a full range and that is on an effort to try and eliminate any, you know, higher speed production types of jobs recognizing that all of these jobs have a production component and that you have to complete a certain amount of time or a certain amount of work for a set period of time." Tr. 69.

In his second hypothetical the ALJ considered everything else to be the same except the hypothetical individual would be limited to sedentary work. Tr. 69. The ALJ asked whether there would be work such an individual could perform. Tr. 69. The VE responded in the affirmative, indicating there would be 'similar types of jobs but for now the Quality Control Examiners, the numbers would be about 7,000 U.S. DOT 739.687-182. Gra[der]s and Sorters, 4,000 U.S. represented by 539.485-010 and we would have Assemblers . . . about 53,000 U.S. including DOT 732.684-062." Tr. 69-70. The VE continued, "again, those three sedentary, unskilled, SVP of either 1 and 2 again, the same reduction in numbers to try to avoid the high speed production." Tr. 70.

The ALJ's third hypothetical was "the same as hypothetical #2, except take the part out where I said they could maintain concentration, persistence and pace for two hour increments and add to it the hypothetical individual would be off task 20% of the workday." Tr. 70. The VE indicated there would be no jobs such an individual could perform at any level. Tr. 70. The ALJ then asked whether there would be jobs if the hypothetical individual was limited to frequent handling and fingering. Tr. 71. The VE indicated frequent would be "okay," but occasional use of hands would eliminate all work at the sedentary level, skilled or unskilled. Tr. 71.

The VE confirmed his testimony was consistent with the DOT except that the DOT does not address the issue of time-off task. Tr. 71. The ALJ indicated that some of his comments in that regard are based on "having interviewed employers about their hiring and their retention policies." Tr. 71.

II.    Discussion

A.    The Commissioner's Findings

In his April 26, 2018 decision, the ALJ made the following findings of fact and conclusions

of law:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.
>
> 2.    The claimant has not engaged in substantial gainful activity since January 1, 2015, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.    The claimant has the following severe impairments: entrapment of the right ulnar nerve, anxiety, depression, back pain, neuropathy status post arthroscopic surgery to the right knee secondary to meniscus tear, and dystonia of the arms and legs (20 CFR 404.1520(c)).
>
> 4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) except the claimant could frequently climb stairs/ramps; occasionally balance, stoop; and should never kneel, crouch, crawl or climb ladders, ropes or scaffolds. The claimant was further limited to occupations requiring no more than simple, routine, repetitive tasks, not performed in a fast paced production environment and involving only simple work-related instructions and decisions and relatively few workplace changes. She is further limited to occupations requiring no more than occasional interaction with co-workers and members of the general public. The claimant will be able to maintain concentration, persistence and pace for 2-hour increments.
>
> 6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on October 17, 1974 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2014,[6] through the date of this decision (20 CFR 404.1520(g)).

Tr. 23-24, 26, 34-36.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

---

[6] As the ALJ noted elsewhere in his decision Plaintiff amended her alleged onset date to January 1, 2015. Tr. 21.

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[7] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant

---

[7] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff alleges the ALJ committed reversible error. Without detailed analysis and without specifically pointing to record medical evidence, Plaintiff submits that the "list of active problems experienced by Plaintiff," as cited by Plaintiff's family doctor, Michael Nunnery, M.D., "constitute insurmountable obstacles to gainful work activity." Pl. Mem. 5, ECF No. 14. Plaintiff generally submits that substantial evidence does not support the ALJ's findings. *Id.* The Commissioner counters that the ALJ's decision is supported by substantial evidence, the ALJ appropriately considered the medical and opinion evidence in determining Plaintiff's RFC, and that the ALJ appropriately considered Plaintiff's subjective complaints. Def. Mem., ECF No. 16. Plaintiff briefly replies, claiming the medical evidence, particularly that from treating physician Dr. Nunnery, supports Plaintiff's subjective allegations and should lead to a finding of disability. Pl. Reply, ECF No. 20.

As an initial matter, the court notes Plaintiff's memoranda are short on evidence-based argument and long on rhetoric, making it difficult to analyze specific appellate issues as it normally does in social security appeals. At bottom, of course, this court's review is to determine whether the ALJ's decision is supported by substantial evidence. *Biestek*, 139 S. Ct. at 1154. Here, then, the court considers the medical evidence, particularly that of treating physician Dr. Nunnery, the opinion evidence, and the ALJ's consideration of such evidence and of Plaintiff's subjective complaints in reaching his decision that Plaintiff was not disabled.

1. Summary of medical evidence

   a. Plaintiff's treatment by Dr. Nunnery and Lexington Family Practice

Plaintiff's amended alleged onset-of-disability date is January 1, 2015. Accordingly, focus on medical evidence on or subsequent to that date is appropriate. As the ALJ noted, the record contains evidence that Plaintiff was treated by Dr. Nunnery and others from Lexington Family Practice from at least June 2014 through April 2016. Tr. 29; *see* Tr. 321-418 (Dr. Nunnery's treatment records, as well as various test results from other providers). Dr. Nunnery's diagnoses included arm, leg, myofascial, joint, and anterior leg pain, as well as peripheral neuropathy, migraine headaches, generalized muscle cramps and aches, anemia, obesity, and lower extremity edema. Tr. 29; *see* Tr. 321, 326-27, 334-35, 343-44, 347-48, 351-52, 389, 393-94, 397, 401, 414. Some of Plaintiff's 2015 visits to Dr. Nunnery were in follow-up to gastric by-pass surgery performed previously by another physician. Plaintiff expressed concerns about weight gain. *See* Tr. 343-45, 347-49. Plaintiff was prescribed medication for weight loss. Her physical examinations at those visits were normal. Tr. 345 (July 14, 2015); Tr. 349 (May 28, 2015). Plaintiff saw Dr. Nunnery on September 28, 2015 complaining of muscle aches. Tr. 339. Dr. Nunnery noted Plaintiff had seen a rheumatologist on September 22, 2015, who had extensive lab work done and

indicated Plaintiff was not likely rheumatoid. *Id*. During the September 28, 2015 visit Dr. Nunnery's physical examination indicated Plaintiff was in no acute distress, had a normal gait and movement of extremities, normal muscle strength and tone, and no joint swelling. Tr. 342. On November 24, 2015, Plaintiff saw PA Robert W. Christensen, who worked with Dr. Nunnery at Lexington Family Practice, Northeast. Tr. 334-37. The reason for that visit was to be assessed for a DOT physical.[8] Tr. 334. PA Christensen noted Plaintiff had been treated for muscle aches and pains but specialists had not "found anything wrong yet." *Id*. PA Christensen's physical examination findings were normal. Tr. 226. He determined it appropriate to issue Plaintiff a one-year certificate regarding her DOT application, noting she would need periodic monitoring to be sure muscle cramps did not worsen. He prescribed migraine medication. Tr. 337. Plaintiff saw Dr. Nunnery on January 19, 2016 complaining of soft-tissue foot pain. Tr. 330. He noted Plaintiff had seen another physician for neuropathy and increased the dosage of Plaintiff's Gabapentin. Tr. 332-33. Plaintiff saw PA Christensen on January 26, 2016, complaining of bilateral arm pain that radiated to her fingers. Tr. 326. On examination it was noted that Plaintiff had tightness but still maintained a full range of motion in her neck and bilaterally for her upper extremities. Tr. 328. Plaintiff saw Dr. Nunnery on March 3, 2016 with continued complaints of bilateral tightness from elbows to shoulder. Tr. 321. On examination, Plaintiff had slightly decreased strength in her upper extremities. Tr. 323. Dr. Nunnery noted that neither he nor rheumatology had a "great answer" regarding her complaints. He "suspect[ed]" Plaintiff had fibromyalgia and indicated a potential referral to another physician. Tr. 323-34.

---

[8] In this context, a "DOT physical" apparently refers to a physical examination required by the Department of Transportation for certain driving-related occupations. *Cf. Squire v. FedEx Freight, Inc.*, No. CV ELH-17-3597, 2020 WL 1235012, at *2, n.3 (D. Md. Mar. 12, 2020) (noting "DOT physical" seemed to refer to a Department of Transportation-required physical).

The records from Lexington Family Practice also include some test results. For example, Plaintiff had various studies done in September 2014. Her September 2014 lumbar spine MRI was normal. Tr. 417. A right lower extremity duplex Doppler ultrasound was also normal and indicated no evidence of deep vein thrombosis. Tr. 413. An MRI of Plaintiff's right leg showed mild pretibial edema, with no stress fracture, no muscle mass or edema. Tr. 392.

   b. Other medical evidence

In September 2015, Plaintiff was admitted to the hospital overnight with complaints of chest pain. Tr. 267. She was diagnosed with acute onset chest pain of unclear etiology and history of gastroesophageal reflux disease. Tr. 269.

Plaintiff saw rheumatologist Bruce Goeckeritz, M.D., in September/October 2015 for polyarthralgia, myofascial pain, right-sided lower back and buttock pain, and muscle cramps. Tr. 273-78. Dr. Goeckeritz thought it was unlikely rheumatic disease and noted Plaintiff's rheumatic illness workup was unremarkable. Tr. 275, 278. He referred her for a neurological workup. Tr. 275.

Plaintiff was admitted to the hospital in March 2016 for complaints of mid-sternal chest pain and tightening with shortness of breath. Tr. 291. Her discharge diagnoses were chest pain with abnormal electrocardiogram, family history of coronary arteriosclerosis, gastroesophageal reflux disease, and obstructive sleep apnea. Tr. 284. Plaintiff followed up with cardiologist Glen Dougherty, M.D. in April 2016. Tr. 419. He noted that her heart catheterization was normal and she had no further chest pain or complications. *Id*. Dr. Dougherty stated that her symptoms were likely non-cardiac and diagnosed resolved chest pain. *Id*.

Plaintiff then saw pulmonologist Mohamed S. Soliman, M.D., between February and April 2016 for sleep evaluation. Tr. 429. She was referred for a sleep study because of snoring, witnessed

apneas, morning fatigue, daytime somnolence, and dry mouth. Tr. 431. Plaintiff noted she had been diagnosed years prior with obstructive sleep apnea, but she had not been using the CPAP mask because of claustrophobia. *Id*. Her sleep study revealed mild obstructive sleep apnea; she was prescribed the use of a CPAP with a nasal mask. Tr. 432.

Plaintiff saw neurologist Donald Schmechel, M.D. for tremor and leg and arm pain on three occasions in 2016. Tr. 445-50, 469-73, 487-93. In October 2016, Plaintiff reported continued leg spasms and arm pain. Tr. 487.

Plaintiff saw endocrinologist Frank J. Ferraro, M.D. in April 2017 for hyperparathyroidism, multi-nodular goiter, Vitamin D deficiency, and obesity. Tr. 592.

In April 2016 and August 2017, Plaintiff was seen at a women's center for complaints of menopause and symptoms associated with depression. Tr. 422, 629. Plaintiff was diagnosed with anxiety, menopause, and depression. Tr. 428.

Kimberly K. Kruse, Psy. D. saw Plaintiff in August 2016 for a consultative psychological examination. Tr. 481-85. Plaintiff reported having been "'really sick' for the last few years with an undiagnosed 'muscle disease'" and depression secondary to that disease. Tr. 481. Plaintiff indicated she got along well with others but had been isolating recently. Tr. 482. During the examination, Plaintiff was oriented, friendly, personable, and ambulated without assistance. Tr. 483. Plaintiff reported having "about 1 week per month of having a good day" and indicated her medications had been helping. *Id*. Plaintiff indicated her activities as walking short distances to exercise, going to the grocery store with her mother, doing laundry when she was able, and managing her own finances *Id*. Plaintiff's psychomotor activity was not remarkable for agitation or retardation, her speech had a normal rate, tone, and rhythm, and her thought process was logical, linear, and goal directed *Id*. Plaintiff had no overt psychosis and her intelligence was estimated to

be in the average range. Tr. 484. Plaintiff's memory was intact, and she could perform simple mathematical calculations from auditory memory without deformity. *Id*. Dr. Kruse's clinical functional evaluation indicated Plaintiff was able to perform her personal hygiene needs independently and maintain activities of daily living. *Id*. In social functioning, she was interpersonally relatable and aware of social cues. *Id*. Regarding concentration, persistence, and pace, Plaintiff was able to understand and follow instructions and capable of performing normal multiple tasks from a cognitive perspective. *Id*. Plaintiff was limited for task completion at times secondary to anhedonia and a lack of energy, but with appropriate rest periods, she was able to complete basic non-stressful tasks. Tr. 484-85. Dr. Kruse felt that she was capable of managing her own funds. Tr. 485. Dr. Kruse diagnosed depressive disorder due to another medical condition. Tr. 484.

From July 2016 through August 2017, Plaintiff was seen in the outpatient clinic at Medical University of South Carolina for lower extremity muscle cramps and abnormal involuntary movements in bilateral lower extremities. Tr. 529-90, 601-13. She was diagnosed with focal dystonia, restless leg syndrome, and peripheral neuropathy. Tr. 601.

In March 2017 Plaintiff had a noninvasive venous evaluation of her right lower extremity because of pain and tenderness after a long car trip. Tr. 557. As interpreted by Timothy P. Close, M.D., the results were normal and negative. *Id.*

A May 1, 2017 MRI with and without contrast was taken because of Plaintiff's dystonia. The MRI was unremarkable. Tr. 570.

Beginning May 2017, Plaintiff was seen by orthopedist Kevin Nahigian, MD., for complaints of bilateral knee pain. Tr. 637. Her X-rays revealed no soft tissue swelling, with good appearing bone density, good alignment, and no joint space narrowing or evidence of tumors,

avascular necrosis of other lesions, and no fractures. Tr. 640. Dr. Nahigian diagnosed patellofemoral stress impingement syndrome of the knees, possible meniscus tear of the right knee and chondromalacia of the patella. Tr. 640, 649. In July 2017, Plaintiff underwent a right arthroscopy lateral knee release and chondroplasty. Tr. 643. She was seen for follow up through November 2017 and was diagnosed with degenerative arthritis status post microfracture of the right knee. Tr. 645, 647, 650. She was "doing well" after surgery and was to be non-weight-bearing for several weeks. Tr. 647. Plaintiff was to continue physical therapy and was advised she did not need to return to Dr. Nahigian's care after September 2017 unless she had further issues. Tr. 647. Plaintiff continued to have knee discomfort, and Dr. Nahigian recommended a series of injections for osteoarthritis of the right knee. Tr. 640, 649-57.

Plaintiff also treated with internist G. Stuart Hooks, M.D., for a variety of conditions including tremor with leg cramps, lower extremity weakness, peripheral neuropathy, and anxiety/depression. Tr. 502-28, 615-27.

From November 2016 through December 2017, Judy Stuck, N.P., diagnosed epigastric pain, history of gastric bypass surgery, morbid obesity, and GERD. Tr. 664, 668, 675, 680, 689. In January 2017, Plaintiff reported walking short distances, which N.P. Stuck encouraged. Tr. 660, 663. Plaintiff also reported multiple stressors at home. Tr. 677. In December 2017, she reported trying to walk some and cycling with her daughters. Tr. 692.

c.   Record opinion evidence

As noted by the ALJ none of Plaintiff's treating medical providers have offered opinions regarding disability. Tr. 33. As set out above, consulting Psy.D. Dr. Kruse provided her input as to Plaintiff's ability to perform the activities of daily living; social functioning; concentration; persistence and pace; and task completion. She did not opine as to whether Plaintiff was disabled

or comment on what type of work, if any, Plaintiff could perform. Tr. 481-85. State agency physician Stephen Wissman, M.D. reviewed Plaintiff's treatment records and provided the following Physical RFC assessment: he found Plaintiff had exertional limitations and would be able to occasionally lift and carry 20 pounds; frequently be able to lift and carry 10 pounds; stand, walk, and sit about six hours in an eight-hour day. Tr. 97-99. Dr. Wissman opined Plaintiff would have postural limitations of climbing ramps and stairs occasionally, never climbing ladders or ropes, and occasionally balancing, stooping, kneeling, crouching, and crawling. Tr. 97. Dr. Wissman noted Plaintiff had documented lumbar/cervical degenerative disk disease that could cause some pain and limitations. Tr. 98. Dr. Wissman found those findings should be afforded only some weight as the evidence as a whole did not support the severity of symptoms claimed by Plaintiff. Tr. 99.  On reconsideration Stephen Burge, M.D. reviewed Plaintiff's treatment records and provided  the following Physical RFC assessment: he found Plaintiff had exertional limitations and would be able to occasionally lift and carry 20 pounds; frequently be able to lift and carry 10 pounds; stand, walk, and sit about six hours in an eight-hour day. Tr. 115-17. Dr. Burge opined Plaintiff would have postural limitations of climbing ramps and stairs frequently, occasionally climbing ladders or ropes, and frequently balancing, stooping, kneeling, crouching, and crawling. Tr. 115. Dr. Burge noted Plaintiff had documented lumbar/cervical degenerative disk disease that could cause some pain and limitations. Tr. 116. Dr. Burge discounted those findings because an "extensive, multispecialty evaluation has failed to objectively establish any etiology for, most of [her] symptoms with deficits noted at the most recent neurologist eval[uations] inconsistent with all previous examinations." Tr. 116. Dr. Burge, too, opined that the evidence as a whole did not support the severity of symptoms claimed by Plaintiff. Tr. 116.

State agency psychologist Kevin King, Ph.D. reviewed Plaintiff's records and opined that Plaintiff's "mental status and daily activities do not reflect severe, disabling functional limitations." Tr. 94-95. On reconsideration, state agency psychiatrist R. Warren, M.D., opined that Plaintiff's anxiety and affective disorders did not restrict her activities of daily living and that she had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. Tr. 112. Dr. Warren opined Plaintiff had the ability to understand and remember simple instructions, attend and concentrate for periods of two hours as required in the workplace, interact appropriately with peers and supervisors, and adapt to normal workplace changes. Tr. 112-13, 117-19. Dr. Warren noted Plaintiff had anxiety and depression related to her physical complaints; he opined she was not precluded from performing simple, routine, repetitive tasks. Tr. 113.

   2.   Consideration of the ALJ's decision

In his detailed decision the ALJ spent several pages summarizing the medical evidence in this matter, including records from treating physician Dr. Nunnery, and found that Plaintiff could perform a limited range of light work. Tr. 26-34. The ALJ proceeded through steps four and five and found that Plaintiff could perform a significant number of unskilled jobs existing in the national economy. Tr. 34-36.

In appealing the Commissioner's decision Plaintiff claims generally that the "treating physicians' records and opinions elucidate uncontroverted facts in support of the proposition that she is unable to engage in any substantial gainful work activity." Pl. Mem. 4. Plaintiff suggests the ALJ "'cherry picked' portions of the evidence and professional evaluations" to arrive at his conclusions "without substantial evidentiary support." *Id*. at 5. Review of the ALJ's decision reveals, however, that the ALJ did what he was required to do—consider the evidence, including

medical evidence and opinions as well as Plaintiff's testimony and activities of daily living, in light of applicable regulations.

a.  The ALJ's RFC assessment is supported by substantial evidence.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4). There is no specific requirement for how the ALJ must articulate the RFC finding; rather, the ALJ need only provide enough discussion for the court to meaningfully review the RFC finding. *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015); *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019).

Here, the ALJ found Plaintiff has the RFC to perform a reduced range of light work, limited to frequent climbing stairs/ramps, occasional balancing and stooping, and never kneeling, crouching, crawling, or climbing ladders/ropes/scaffolds. Tr. 26. Additionally, the ALJ found Plaintiff was limited to occupations requiring no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment and involving only simple work-related instructions and decisions and relatively few workplace changes *Id*. Plaintiff was limited to occupations requiring no more than occasional interaction with co-workers and members of the general public. The ALJ found Plaintiff would be able to maintain concentration, persistence, and pace for two-hour increments. *Id*. The ALJ noted that in making this finding he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527." *Id.*

Here, the ALJ explained the RFC finding was supported by Plaintiff's conservative longitudinal treatment history. The ALJ noted that, as of Plaintiff's amended onset date of January 1, 2015, Plaintiff was not in the midst of ongoing treatment. Tr. 31. Rather, Plaintiff had been seen by a neurologist in October 2014, and an EMG suggested ulnar nerve entrapment, but showed no evidence of polyneuropathy. Tr. 31 (citing exs. 1F and 5F). The ALJ further noted that virtually all physical examinations included in the evidence throughout noted full range of motion of the upper extremities (with some tenderness of the right upper extremity) and a normal gait. Tr. 32. The ALJ noted Plaintiff's successful arthroscopic surgery for repair of a torn meniscus in July 2017 with reported improvement in her knee pain, and noted Plaintiff's testimony that she was not receiving further specialized treatment other than pain medication. Tr. 32 (citing ex. 19F). The ALJ also discussed Plaintiff's anxiety and depression, noting Plaintiff's testimony that they were treated, and helped, by medications prescribed by her family physician. Tr. 27, 55. The ALJ also discussed in detail the report of Dr. Kruse, an examining mental-health consultant. *See* Tr. 29 (citing ex. 10F).

The ALJ also considered the opinion evidence of record in assessing Plaintiff's RFC. Tr. 33. Significantly, the ALJ noted that none of Plaintiff's treating or examining physicians offered an opinion regarding disability or assessed Plaintiff's physical abilities or abilities to perform activities of daily living. *Id.* This includes Plaintiff's longtime treating physician Dr. Nunnery. The ALJ did consider, and give partial weight to, the opinions of state agency examiners who reviewed Plaintiff's records and offered opinions as to her RFC. Tr. 34. *See* 20 C.F.R. § 404.1527. Drs.

Wissman and Burge opined that Plaintiff could perform a range of light work with certain postural limitations. Tr. 35; *see* Tr. 97-99, 115-17. On reconsideration, Dr. Warren opined that Plaintiff's anxiety and affective disorders were severe, but that she remained able to understand and remember simple instructions, attend and concentrate for periods of two hours as required in the workplace, interact appropriately with peers and supervisors, and adapt to normal workplace changes. Tr. 112-13, 117-19. As Dr. Warren explained, Plaintiff had anxiety and depression related to her physical complaints, but she was not precluded from performing simple, routine, repetitive tasks. Tr. 113. All State agency experts opined Plaintiff retained the RFC to perform work activity. The ALJ found their opinions were not contradicted by the record and afforded them weight to the extent supported by the record. Tr. 34. The court finds the ALJ's consideration of the opinion evidence was appropriate and in accordance with regulations.

Further, the ALJ explained that the RFC finding was supported by Plaintiff's ability to perform numerous daily activities despite her medical conditions. Tr. 32. As the ALJ noted, Tr. 32, Plaintiff testified that she was the primary caregiver for her 12- and 13-year-old children, Tr. 59. The ALJ noted Plaintiff is able to perform activities of daily living independently and that she cooked, cleaned, shopped, drove, helped her children get ready for school, helped with housework, prepared meals, managed her finances, accessed health care and took medication appropriately, ran errands, and could adhere to social conventions. Tr. 32-33. The ALJ also observed Plaintiff during the hearing, noting she sat without any visible signs of discomfort, answered all questions clearly and coherently, and entered and exited the courtroom without any problems with a normal gait, and used a cane while ambulating. Tr. 33. The ALJ's analysis is supported by substantial evidence. Review of the ALJ's decision indicates he analyzed relevant evidence throughout the

decision, providing "a logical explanation of how [he] weighed the record evidence and arrived at [his] RFC findings." *Thomas v. Berryhill*, 916 F.3d at 310.

> b.  The ALJ appropriately evaluated and discounted some of Plaintiff's subjective complaints.

In arguing that the ALJ's decision should be affirmed the Commissioner also analyzes the ALJ's consideration of Plaintiff's subjective complaints. Def. Mem. 13-16. To the extent Plaintiff's brief could be construed as raising an allegation of error concerning the treatment of subjective complaints, the court agrees with the Commissioner that there was no such error.

A claimant's subjective allegations of pain or other symptoms alone can never establish disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1528(a), 404.1529(a); Social Security Ruling (SSR) 16-3p, 2016 WL 119029, at *2 (Mar. 16, 2016). Rather, the ALJ must consider "the extent to which [statements about subjective] symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence" in the record. *Id*. The Fourth Circuit has established a two-step process for determining whether a claimant is disabled by pain or other symptoms. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, a claimant must provide objective medical evidence showing that a medical impairment exists, which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 404.1529(b); *Craig*, 76 F.3d at 594. If the claimant meets this threshold obligation, the ALJ then considers the intensity and persistence of the claimant's pain or other symptoms, and the extent to which it affects her ability to work. 20 C.F.R. § 404.1529(c); *Craig*, 76 F.3d at 595. The ALJ has the sole responsibility to weigh the claimant's complaints against the record as a whole, and he may discount them when they are unsupported. *Craig*, 76 F.3d at 592-95.

Here, the ALJ followed the regulations and applicable law by carefully considering

Plaintiff's testimony, articulating why he found it to be only partially supported by the record, and specifically identifying the substantial evidence in the record that supported his analysis. Tr. 26-34. The ALJ relied on Plaintiff's routine and conservative longitudinal treatment history, her positive response to medications, her unremarkable physical and mental status findings, and the opinions of the state agency medical consultants in finding Plaintiff's complaints of pain were not fully credible. *See* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence… is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work").

The ALJ explained that Plaintiff's testimony was not entirely supported based on her ability to perform a wide array of daily activities as discussed above, including her being the primary caretaker of her 12- and 13-year-old children. Tr. 32. The ALJ appropriately relied on Plaintiff's daily activities to find her testimony was not entirely supported. *See* 20 C.F.R. § 404.1529(c)(3)(i) (explaining that the ALJ will consider the claimant's daily activities when evaluating symptoms).

Furthermore, as noted by the Commissioner in his brief, the ALJ did not ignore Plaintiff's testimony about her pain and limitations. By issuing the highly restrictive RFC finding, the ALJ accounted for Plaintiff's subjective complaints when evaluating her claim. *See Hines v. Barnhart*, 453 F.3d 559, 565, n.3 (4th Cir. 2006) ("[A] claimant's allegations about [his] pain . . . need not be accepted to the extent they are inconsistent with available evidence . . . .").

Further, Plaintiff's argument in her brief that her "stable vocational history over an extended career" would "equate to credibility" does not render the ALJ's decision invalid or unsupported. *Maner v. Colvin*, No. CA 1:12-2969-RBH, 2014 WL 4656383, at *5 (D.S.C. Sept. 17, 2014) ("[W]hile a long work history may be a factor supporting credibility, it is not controlling.").

Here, the ALJ followed the applicable regulations in considering and discounting some of Plaintiff's subjective complaints. Tr. 26-34. Plaintiff's disagreement with the ALJ's decision is not reason to overturn it. *Johnson v. Barnhart*, 434 F.3d at 653 (quoting *Craig*, 76 F.3d at 589).

At bottom, the court finds that the ALJ's decision is supported by substantial evidence. Plaintiff is correct that an ALJ may not simply "cherry pick" portions of the evidence to support his conclusions. Pl. Mem. 5; *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017). Here, though, the ALJ directly addressed Plaintiff's medical records, acknowledged her several severe impairments, and explained with citations to the record why he found Plaintiff was not limited to the extent she alleged. The ALJ did not improperly cherry-pick the record; his decision is supported by substantial evidence. *See Hall v. Saul*, No. 1:19-CV-01637-RBH, 2020 WL 6156535, at *9 (D.S.C. Oct. 21, 2020) (finding ALJ appropriately considered the record and had not "cherry-picked" evidence only to support his findings).

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

January 15, 2021                                             Kaymani D. West
Florence, South Carolina                               United States Magistrate Judge